# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| In the Matter of THE JEREMY | ) | |
| PARADISE DYNASTY TRUST and THE | ) | C.A. No. 2021-0354-KSJM |
| ANDREW PARADISE DYNASTY | ) | |
| TRUST | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: October 10, 2022
Date Decided: January 31, 2023

Jonathan M. Stemerman, ARMSTRONG TEASDALE LLP, Wilmington, Delaware; Richard Scheff, ARMSTRONG TEASDALE LLP, Philadelphia, Pennsylvania; John A. Sten, Jason C. Moreau, Allison McFarland, ARMSTRONG TEASDALE LLP, Boston, Massachusetts; *Counsel for Petitioner Jeremy Paradise*.

Henry E. Gallagher, Jr., Gregory J. Weinig, Scott E. Swenson, Jarrett W. Horowitz, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; Lazar P. Raynal, Michael Lombardo, KING & SPALDING LLP, Chicago, Illinois; Julia C. Barrett, KING & SPALDING LLP, Austin, Texas; *Counsel for Respondents Charlotte Edelman, Casey Chafkin, and John Pomerance*.

**McCORMICK, C.**

In 2019, brothers Andrew and Jeremy Paradise created two trusts to hold stock—the "Andrew Trust" and the "Jeremy Trust" (together, the "Trusts").[1] The Andrew Trust was formed to support Jeremy's personal spending, while the Jeremy Trust was formed to protect assets for the benefit of their mother and Jeremy's children. Attorneys prepared the trust agreements. Each trust agreement provided for a "Trust Protector," and included a list of persons in "position" to appoint, remove, and replace the Trust Protector (each the "Andrew Trust Agreement" and "Jeremy Trust Agreement" and together the "Trust Agreements"). Although an early draft of the Jeremy Trust Agreement placed Jeremy in the "first position" with the right to select the Trust Protector, Andrew was in the first position under the final versions of both trust agreements. Jeremy did not know this because he did not read the Jeremy Trust Agreement before he signed it, despite being asked and given multiple opportunities to do so.

The stock held by the trusts later increased in value. Jeremy believed, erroneously, that he had the ability to access that value, but Trust Protectors appointed by Andrew blocked him from doing so. This prompted Jeremy to read the Jeremy Trust Agreement for the first time. He learned that Andrew alone had the power to appoint, remove, and replace the Trust Protectors under the Jeremy Trust Agreement. He filed this claim to reform the Jeremy Trust Agreement to place himself in the first position.

---

[1] For clarity, the court refers to Andrew and Jeremy Paradise by their first names. The court intends no familiarity or disrespect in this designation.

Jeremy advances a number of theories in support of his request to reform the Jeremy Trust Agreement. Each theory requires Jeremy to prove that he had a clear intent to be placed in the first position at the time he executed the Jeremy Trust Agreement. Jeremy has failed to prove that he had any intent at all when executing the agreement, and *ex post* desires will not suffice. The court therefore enters judgment in favor of the respondents.

## I.    FACTUAL BACKGROUND

The court held a two-day trial on May 3 and May 4, 2022. As reflected on the Schedule of Evidence, the record comprises 258 trial exhibits, live witness testimony from five fact witnesses, video deposition testimony from three fact witnesses, depositions from ten witnesses, and twenty-three stipulations of fact. These are the facts as the court finds them after trial.[2]

### A.    The Brothers Agree To Establish The Trusts.

Andrew has described Jeremy as having a history of "poor money management."[3] According to Andrew, after Jeremy "squander[ed] away the money that he [had] access

---

[2] The Factual Background cites to: C.A. No. 2021-0354-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); the trial transcript (Dkts. 198–199) (collectively, "Trial Tr."); and stipulated facts set forth in the Parties' Amended Joint Pre-Trial Order (Dkt. 191) ("PTO"). The following live witnesses testified at trial: Michael Gordon, Daniel Hayward, Jeremy Paradise, John Pomerance, and Charlotte Edelman. Deposition transcripts, cited as "[Witness Name] Dep. Tr.," were lodged for the following witnesses: Joseph Bosik, Casey Chafkin, Charlotte Edelman, Alison Glover, Michael Gordon, Daniel Hayward, Andrew Paradise, Jeremy Paradise, John Pomerance, and Kurt Steinkrauss.

[3] Trial Tr. at 450:1–19 (Andrew).

to,"[4] he would turn to Andrew for money.[5]  A long-time friend of the Paradise brothers, attorney John Pomerance, shared Andrew's view of Jeremy's proclivities.  This decision elides the details of the testimony of Andrew and Pomerance on this topic, except to say that it is obvious that both Andrew and Pomerance genuinely held such beliefs and concerns regarding Jeremy.

In 2012, Andrew co-founded a company that later became known as Skillz.[6]  Skillz is a technology company that holds a variety of patents, including a mobile-based gaming platform that enables social competition in their games and hosts casual esports tournaments for mobile players worldwide.[7]  Jeremy received 5% of the equity.[8]

In 2018, Andrew and Jeremy began discussing the idea of placing Jeremy's Skillz shares in trust.[9]  Andrew suggested the idea, motivated in part by a desire to protect Jeremy and his children from what Andrew perceived as Jeremy's over-spending.[10]

The initial discussion was precipitated by Jeremy's May 2018 request for an "interim loan" from Andrew.[11]  At the time, Jeremy was in property development and he

---

[4] *Id.*

[5] Chafkin Dep. Tr. at 57:6–58:9; Pomerance Dep. Tr. at 44:11–24, 197:21–198:18; Trial Tr. at 430:8–13 (Andrew); *see also, e.g.*, JX-113 at PET 002360 (Andrew loaning Jeremy $50,000).

[6] JX-231 ¶ 2; *see also* PTO at 12 ¶ 11.

[7] PTO at 12 ¶ 11.

[8] *Id.* at 13 ¶ 14.

[9] *Id.* at 13 ¶ 15.

[10] Trial Tr. at 448:19–449:7, 450:1–451:13 (Andrew); *see also* JX-25 at PET 006561 (text message from Jeremy to Andrew dated May 24, 2018).

[11] Trial Tr. at 142:16–143:21 (Jeremy).

3

wanted the loan to acquire a property.[12] Andrew was annoyed by the request, but offered Jeremy two potential deals, one of which required Jeremy to transfer "the property + your skillz stock [] into a trust."[13] Jeremy rejected Andrew's offer, stating that "[S]killz stock never was discussed going into trust" and telling Andrew not to "bring [his] opinions about my money management or business acumen into it either . . . . [You are] not taking anything of mine and putting it into a trust."[14]

Later that year, Andrew offered to facilitate a sale of some of Jeremy's then-illiquid Skillz shares to help Jeremy, but only if Jeremy agreed to put the remaining Skillz shares into a trust.[15] This time, Jeremy was receptive to the idea; he wanted liquidity and to protect his Skillz shares from his wife in the event of a divorce.[16] The brothers began to discuss the proposed terms of the trust.[17]

On or about December 11, 2018, Andrew emailed Jeremy to "captur[e] [the brothers'] conversation" regarding their proposed deal structure before they spoke with an estate planning attorney.[18] At this point, the parties envisioned setting up only one trust,

---

[12] *Id.*

[13] JX-25 at PET 006553.

[14] *Id.* at PET 006553, 006560–61.

[15] Chafkin Dep. Tr. at 57:6–58:9; Trial Tr.at 448:7–18 (Andrew).

[16] Jeremy Dep. Tr. at 96:4–12, 97:15–98:3; JX-113; Pomerance Dep. Tr. at 43:12–44:2; JX-247 at 10 (interrogatory response stating that Jeremy sought trust protection for his assets "for estate planning and tax efficiency purposes, to protect those assets from unexpected life events, and to provide for his children").

[17] JX-29.

[18] *Id.* at PET 001210–11; *see also* JX-27 (same).

4

making Jeremy the lead trustee and Andrew the other trustee "in charge of managing it[.]"[19] Jeremy responded by email on December 13, 2018, suggesting that the parties include explicit language "that upon the sale of the [Skillz] equity proceeds[, the] remaining stock would get moved into trust. Something like that."[20] Jeremy testified at trial that he wanted to sell the Skillz stock contemporaneously with the creation of the Trusts to ensure cash would be available to cover trust administration expenses.[21] Andrew agreed to Jeremy's terms, and later that day replied that he would "have the lawyers set this up so that it all closes simultaneously."[22]

Even after the brothers discussed this preliminary deal, Jeremy remained reluctant to transfer his Skillz shares to a trust. On February 20, 2019, Jeremy texted his mother that he was "[t]alking to Andrew at 9pm [a]bout skillz stock sale[.] Hopefully [i]t's not going to devolve in huge argument."[23] Jeremy's mother told him to "[j]ust say yes," to which Jeremy responded that "I'm not going to say yes to what [Andrew] wants [a]s it won't work. He wants me to put all my stock in a trust for my unborn child[,] [w]hich will not let me tap it if I need it[.] That makes no sense."[24] At trial, Jeremy testified that, as a

---

[19] JX-29 at PET 001210–11.

[20] *Id.* at PET 001210.

[21] Trial Tr. at 240:23–242:16 (Jeremy).

[22] JX-29 at PET 001209.

[23] JX-39 at PET 006753.

[24] *Id.* at PET 006754–55.

5

general matter, he has a hard time ceding control over money, so "giving it to anyone that's not myself is a big problem[.]"[25]

Jeremy's agita aside, the trust creation process marched forward. On or around February 25, 2019, the brothers spoke to Kurt Steinkrauss,[26] an estate planning attorney at Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz"). Steinkrauss informed Jeremy and Andrew that their intended trust structure—in which Jeremy would be both trustee and beneficiary—would result in adverse tax consequences and would not protect Jeremy's assets in the event of a divorce.[27] As an alternative, Steinkrauss proposed a two-trust structure.[28] Andrew would agree to establish the "Andrew Trust", which would house approximately two million shares of Andrew's Skillz stock for Jeremy's benefit.[29] Jeremy, in turn, would agree to transfer his remaining Skillz stock into the "Jeremy Trust" for the benefit of their mother and Jeremy's then-unborn children.[30] This two-trust structure was

---

[25] Trial Tr. at 159:4–19 (Jeremy).

[26] JX-43.

[27] Jeremy Dep. Tr. at 120:7–121:19; Trial Tr. at 447:1–448:6 (Andrew); *id.* at 157–13 (Jeremy).

[28] Neither Jeremy, Andrew, nor Steinkrauss could remember who first raised the two-trust structure or exactly when, beyond that the idea came from legal counsel at some point between December 2018 and March 2019. *See* Trial Tr. at 447:1–15 (Andrew); *see also id.* at 402:19–404:16 (Andrew); *id.* at 157:1–21 (Jeremy); Steinkrauss Dep. Tr. at 48:2–49:16, 344:7–15. Nonetheless, the idea seems to have emerged around the same time the Paradise brothers met with Steinkrauss, who among the three is the only lawyer with a background in trust-related matters. *See* Steinkrauss Dep. Tr. at 12:21–24 (identifying primary areas of practice). From these facts, the most likely version of events is that Steinkrauss first proposed the two-trust structure to the brothers on February 25, 2019.

[29] Trial Tr. at 447:1–449:24 (Andrew).

[30] *Id.* at 158:18–159:3 (Jeremy); *id.* at 447:1–448:6 (Andrew); JX-39.

a workaround to the problems of which Steinkrauss had informed the brothers.[31]  Although Jeremy continued to have misgivings,[32] the process moved forward.

### B.    The Brothers Execute The Trust Agreements.

After the brothers agreed to establish the Trusts, they were referred to the Delaware law firm of Gordon, Fournaris & Mammarella, P.A. ("GFM").  GFM spearheaded the drafting effort.[33]  Mintz remained involved in the process.

#### 1.    The Drafting History

On March 6, 2019, GFM emailed the brothers draft engagement letters.[34]  The email also attached memorandum from GFM attorney Michael Gordon containing an "Outline of Terms Of Jeremy Paradise Delaware Dynast Trust."[35]  The outline was written in the first person from Gordon.  It stated that "[t]the purpose of this outline is to provide you with a structure for the Trust and to highlight some key issues for you to consider as part of the Trust planning."[36]

---

[31] Jeremy Dep. Tr. at 120:7–121:5.

[32] Trial Tr. at 159:13–19 (Jeremy) (Jeremy saying he was not "a hundred percent on board with everything" but "I liked 90 percent of it").

[33] Trial Tr. at 163:17–23 (Jeremy); PTO at 13 ¶ 17 (stating as undisputed that on or about March 6, 2019, Jeremy and Andrew retained GFM as Delaware counsel for trust formation purposes).

[34] JX-51.

[35] *Id.*; JXs-53–54, 56–57.

[36] JX-51 at GFM 000432.

These outlined terms included the concept of a "Trust Protector"—someone who "play[s] a key role in the administration of the Trust" in various capacities.[37] Among other things, the Trust Protector has authority to remove and replace persons involved in the supervision of the trust, such as the Trustee, Investment Direction Advisors, and Distribution Advisers.[38] The Trust Protector may also appoint additional or successor Trust Protectors.[39] Through the outline, Gordon advised Jeremy: "[y]ou will need to decide who you would like to appoint as the initial Trust Protector of the Trust," adding that Jeremy could not appoint himself for tax reasons.[40]

The outline also called out provisions addressing the removal and replacement of the Trust Protector. The outline stated that "[t]he Trust will contain a mechanism permitting individuals to remove and replace the Trust Protector."[41] Gordon wrote: "I typically provide in my trusts that the grantor, while living and competent, followed by the beneficiaries of the trust have the authority to remove and replace the Trust Protector."[42] Specifically, the parties would agree upon certain individuals, set out in an order of priority, who had the power to remove and replace the Trust Protector. The person with the highest priority was called the person in the "first position." Under the default terms, the grantor

---

[37] *Id.* at GFM 000437.

[38] *Id.* at GFM 000437–38.

[39] *Id.*

[40] *Id.* at GFM 000438.

[41] *Id.*

[42] *Id.* at GFM 000438.

8

was in the first position, "followed by the beneficiaries of the trust"[43] in secondary positions.

Each brother executed his own engagement letter retaining GFM on March 8, 2020.[44] There is no dispute that GFM represented both Andrew and Jeremy. GFM represented Jeremy in connection with the Jeremy Trust and had authority to draft and edit the Jeremy Trust Agreement on his behalf.[45]

On March 14, 2019, GFM attorney Daniel Hayward emailed Andrew, Jeremy, and Steinkrauss initial drafts of the Trust Agreements for "review and comment."[46] Section 12(h) of the initial drafts stated the priority of Trust Protectors. In Section 12(h) of the initial draft of the Jeremy Trust Agreement, Jeremy was in the first position as Trust Protector.[47] It provided "the power to remove any Trust Protector by providing written notice to such Trust Protector, the Trustee and the Notice Recipients" to "1. [t]he Grantor, while living and competent; thereafter 2. [t]he Grantor's Brother, while living and competent[.]"[48] The email also attached a summary of the agreements, but the summary did not call out the relative positions of Jeremy and Andrew in Section 12(h).[49]

---

[43] *Id.*

[44] JXs-56–57 (GFM Engagement Letters signed March 8, 2019).

[45] Jeremy Dep. Tr. at 144:8–145:5, 335:21–24; Hayward Dep. Tr. at 171:23–172:10; *see also* PTO at 13 ¶ 13; Dkt. 181 (Resp'ts' Pre-Trial Br.) at 14.

[46] JX-63; *see also* JX-66; PTO at 13 ¶ 18.

[47] *See* JX-63 at GFM 000331.

[48] *Id.* The drafts of Section 12(h) also listed persons in third and fourth position to remove the Trust Protector, but they are not directly relevant to this case.

[49] *Id.* at GFM 000288–93.

9

Andrew reviewed the initial draft.[50] Andrew believed that Section 12(h) did not reflect the brothers' agreement. According to Andrew, the brothers had agreed that he (Andrew), not Jeremy, was supposed to be in the first position to remove and replace the Trust Protector under both Trust Agreements.[51]

Several day later, on March 18, 2019, Andrew and Jeremy exchanged texts. Andrew texted Jeremy asking whether he had reviewed the trust documents.[52] Jeremy stated that he had not yet read the initial drafts circulated by GFM.[53] Andrew then informed Jeremy that the trust documents still required input, that "they're fixing it," and that Jeremy could wait to review the updated drafts of the Trust Agreements later that week to review the versions with all of his edits incorporated.[54] Jeremy responded that he would read the Trust Agreements when they were ready to sign.[55] That evening, Andrew spoke to Steinkrauss about several updates to the draft he wanted.[56]

---

[50] Trial Tr. at 410:21–411:23, 412:15–23 (Andrew).

[51] *Id.*

[52] JX-68 at PET 006602.

[53] *Id.*

[54] *Id.* at PET 006603–04.

[55] *Id.* at PET 006605. At trial, Jeremy claims to have read this first version at some point but said he "couldn't understand" it. Trial Tr. at 172:8–9 (Jeremy). It is unclear from the record whether Jeremy meant he tried to read the first draft but stopped after finding it inaccessible or if he simply misremembered. Suffice it to say that at no point did Jeremy familiarize himself with the terms of the first draft of the Jeremy Trust Agreement, including but not limited to Section 12(h).

[56] *See* JX-71 at GFM 000285.

On March 19, 2019, Andrew emailed both GFM and Jeremy, informing them of his conversation with Steinkrauss and that Mintz would be contacting GFM to provide Andrew's input on the draft Trust Agreements.[57] Andrew also forwarded Dan Hayward's email from March 14, 2019, to Gigi Orta and Eavenson Horter at J.P. Morgan—originally selected as trustees—and asked for their input, saying that Steinkrauss "needs to sync up with you / [Gordon] as there were a number of areas that needed input on these docs."[58]

Also on March 19, 2019, Mintz attorney Alison Glover contacted GFM and provided Andrew's input to the initial drafts.

When speaking to GFM, Glover instructed GFM to edit Section 12(h) of the Jeremy Trust Agreement to place Andrew in the first position.[59]

On March 20, 2019, GFM incorporated Andrew's changes and GFM attorney Joe Bosik emailed the revised drafts to Glover for her review.[60] Bosik also included redlines reflecting changes of the March 20 draft against the March 19 drafts. Glover sent the revised drafts and redlines to Jeremy and Andrew for their review.[61]

The redline captured Glover's requested edits to Section 12(h) in the Jeremy Trust Agreement. As revised, Section 12(h) gave "the power to remove any Trust Protector by providing written notice to such Trust Protector, the Trustee and the Notice Recipients" to

---

[57] *Id.*

[58] JX-72 at 001431.

[59] JX-73 (GFM notes from March 19, 2019 call with Glover).

[60] JX-74.

[61] JX-75.

"1. [t]he Grantor's *Brother*, while living and competent; thereafter 2. [t]he Grantor, while living and competent[.]"[62] The redline highlighted edits in color, with underlines, and with a strike-through on certain text.[63] Anyone who opened and scrolled through the redline would have been able to identify that Section 12(h) was edited and to understand the nature of that edit.

On March 27, 2019, Mintz sent a belated engagement letter to Andrew.[64] Mintz never sent a similar engagement letter to Jeremy.[65] Jeremy thought that Mintz, like GFM, represented both brothers, but Mintz denied that it ever represented Jeremy.[66] It is clear that, when engaging with GFM, Mintz represented Andrew's interests only.

On March 28, 2019, GFM's Hayward circulated updated drafts of the Trust Agreements to Jeremy and Andrew for review.[67] GFM did not edit Section 12(h) of the Jeremy Trust Agreement. Like the March 20 draft, the March 28 draft had Andrew in the first position in Section 12(h).[68]

---

[62] *Id.* (emphasis added).

[63] *See id.*

[64] JX-82; Steinkrauss Dep. Tr. at 22:15–23:20.

[65] Pomerance Dep. Tr. at 98:14–20 ("Jeremy never had a personal engagement with Mintz.").

[66] Steinkrauss Dep. Tr. at 111:18–20.

[67] JX-84.

[68] *Id.* at PET 001931.

12

On April 2, 2019, Andrew texted Jeremy to encourage him to review the Trust Agreements, asking Jeremy "did you look at the docs btw? [W]e gotta [sic] setup the trusts."[69]

Jeremy did not plan to read the Trust Agreements for a few reasons. For one, he was distracted by important life events—his "son had just been born, or was about to be born."[70] For another, he "just didn't have that much interest in" in the "tax stuff" and other matters.[71] In response to Andrew's text, Jeremy wrote, "I'll sign whenever you tell me they are ready . . . . I'm just going to trust your edits."[72] By this, Jeremy meant that he did not intend to read the drafts.[73] And he did not read the drafts at the time. At most, he said, he "read a little bit" of the very first draft of the Jeremy Trust Agreement, but nothing beyond that.[74] In late March, Jeremy "figured [his] brother was just taking care of everything" and testified that he "did not feel like participating or editing anything anymore."[75]

---

[69] JX-90 at PET 006606.

[70] Trial Tr. at 181:17–182:3 (Jeremy).

[71] *Id.*

[72] JX-90 at PET 006606–08.

[73] Trial Tr. at 181:14–16 (Jeremy) ("Q. [W]hy did you say that? A. Because I did not want to go and get involved with all of this stuff.").

[74] *See id.* at 169:18–22 (Jeremy) ("Q. [D]o you remember looking at [the March 14, 2019 draft] when you received it? A. So I opened the document, I read a little bit of it, and it was confusing. And so I shut it and did not read any more of it.").

[75] *Id.* at 181:14–182:3, 261:1–7 (Jeremy).

13

On April 9, 2019, GFM paralegal Jennifer Hutchinson sent Jeremy and Andrew the execution versions of the Trust Agreements for their final review and signature.[76] Like the prior two drafts, the execution version of the Jeremy Trust Agreement had Andrew in the first position to remove and replace the Trust Protector in Section 12(h).[77]

On April 22, 2019, Steinkrauss wrote back to Hutchinson and others at GFM and Mintz, asking to confirm that "Andrew [is] to have control of his trust solely" but "Andrew and Jeremy [are] to have joint control together over Jeremy's trust."[78] On April 23, 2019, Hayward responded that Andrew "alone has the authority to remove and replace the Trust Protector . . . . If that should be changed, please let me know."[79] Steinkrauss responded that "Andrew is fine the way it is. They are going to sign today."[80]

Jeremy signed the final version of the Jeremy Trust Agreement on April 23, 2019.[81] He did not ask any questions about the Trust Agreements before signing them.[82] At trial, he restated his view that he was Mintz's client and that they had "advised [him] on it."[83] Andrew signed the Andrew Trust Agreement on April 25, 2019.[84]

---

[76] JX-95; PTO at 14 ¶ 21.

[77] JX-95 at PET 002115.

[78] JX-100 at GFM 000122.

[79] *Id.* at GFM 000121.

[80] *Id.*

[81] JX-101.

[82] *Id.*; Hayward Dep. Tr. at 203:6–204:13, 223:5–224:16.

[83] Trial Tr. at 140:7–11 (Jeremy).

[84] JX-111.

On May 10, 2019, Jeremy and Andrew executed a Stock Power Transfer in which Jeremy transferred 3,006,620 Skillz stock units to the Jeremy Trust, and Andrew transferred 2,036,025 Skillz stock units into the Andrew Trust for Jeremy's benefit.[85] When Jeremy transferred his Skillz stock to the Jeremy Trust, the value of the then-illiquid stock was approximately $3,006,620.[86] On May 23, 2019, Jeremy sold the remainder of his Skillz stock for $1 million.[87]

### 2. The Brothers' Competing Recollections

The brothers have different recollections of their agreement and the drafting history.

According to Jeremy, Andrew approached him with an offer to help liquidate $1 million of Jeremy's Skillz equity so long as he put the remaining shares into a trust.[88] Andrew's stated reason for wanting a trust, according to Jeremy, was to protect the stock from Jeremy's father-in-law, who might try to pressure Jeremy's wife to divorce him to gain control of the Skillz stock.[89] Jeremy agreed because he wanted the liquidity.[90]

---

[85] JX-116. The petition says that Jeremy understood that Andrew would be transferring an "equal amount" of Skillz shares into the Andrew Trust. *See* Pet. ¶¶ 51–53, 91, 156. Jeremy, however, was informed of how much stock each brother was transferring into their respective trust at the time. *See* JX-116 at PET 002393 (Annex A).

[86] JX-127 at PET 002501 (stock purchase agreement schedule denoting stock price of $1 per share).

[87] JX-127 (email from Mintz to Jeremy and his wife dated May 23, 2019 attaching stock purchase agreement and an irrevocable stock power); JX-128 at PET 002522 (DocuSign email indicating Jeremy and his wife's signature); *see also* JX-129 (jubilant text from Jeremy to Pomerance saying "Got my money!!!!! :).").

[88] *See id.* at PET 004706; Trial Tr. at 227:4–23 (Jeremy).

[89] JX-192 at PET 004706.

[90] *Id.*

Counsel advised the brothers that Jeremy could not be a beneficiary of his shares and keep them out of his marital estate—i.e., he could not be both a beneficiary of the stock in the Jeremy Trust while also protecting that stock from the poaching reach of his in-laws.[91] Hence, the brothers decided to make their mother and Jeremy's descendants beneficiaries of the Jeremy Trust, with the understanding that "Jeremy would be able to use most of those assets" because "the use of those assets would benefit [his son] anyways."[92]

By contrast, Andrew recalls having extreme concern about Jeremy's poor money management.[93] For Andrew, the process was always about "intend[ing] to protect" Jeremy from himself.[94] Toward this end, at all points in the process, Andrew believed he "was supposed to be in charge of both trusts[,]" a position to which Jeremy had agreed "repeatedly."[95]

### C. The Brothers Spar Over Control Of The Trust Assets.

In late 2020, Skillz went public through a merger with a special purpose acquisition company, which increased the value of Skillz stock.[96] Jeremy was ecstatic. On December 17, 2020, the day after Skillz went public, Jeremy texted Pomerance, "[m]y stake[']s worth like $90m???? Wtf."[97] Pomerance responded: "don't get too excited. It[']s on paper and

---

[91] *Id.*

[92] *Id.*

[93] Trial Tr. at 460:1–15 (Andrew).

[94] *Id.* at 451:4–13 (Andrew).

[95] *Id.* at 453:11–18 (Andrew).

[96] JX-228 ¶¶ 12, 43.

[97] JX-155 at PET 006658.

in trust," noting that the trust "[a]ffects what you can spend[.]"[98]  Jeremy replied, "[s]o what? . . . Our [agreement] always was whatever it makes in income . . . I can have[.]"[99] Although Jeremy acknowledges that the Jeremy Trust "[m]eans [the money] can't be touched by [his in-laws]," Jeremy rebuked Pomerance's statement that Jeremy could only spend if Andrew "release[s] the $$."[100]

Jeremy made clear his mistaken belief that Andrew had no authority as to the Jeremy Trust, stating that "Andrew has no legal title on my trust[.]"[101]  In the same thread, Jeremy said that the "original deal" was that all income from the Trusts would be distributed to him, asking rhetorically, "[w]hat's the point of a trust if it doesn't provide benefit to me[?]"[102]

According to Pomerance, around the same time, Jeremy continually "badger[ed]" him "about making large distributions" to himself from the Trusts, including requests for $2.5 to $3 million per year, to have one of the Trusts purchase a house in Nantucket, and to get an airplane to take him to and from Nantucket.[103]  In January 2021, Jeremy requested

---

[98] *Id.* at PET 006659–62.

[99] *Id.* at PET 006664.

[100] *Id.* at PET 006662–63.

[101] *Id.* at PET 006662–63, 006665.

[102] *Id.* at PET 006663–64, 006667–70.

[103] Pomerance Dep. Tr. at 52:8–53:12, 193:22–196:20; Trial Tr. at 474:18–475:7 (Pomerance).

that one of the Trusts invest approximately $2 million to purchase and renovate a property located at 73 Halifax Street, Jamaica Plain, Massachusetts (the "Halifax Property").[104]

Andrew was concerned about Jeremy exceeding the budget for the house purchase by hundreds of thousands of dollars, which Andrew had covered with a loan to one of the Trusts.[105] Frustrated by what they saw as the latest instance of Jeremy's financial mismanagement, Andrew and Pomerance appointed Charlotte Edelman and Casey Chafkin as additional Trust Protectors to supervise the investments made by the Jeremy Trust.[106] Edelman, a former Mintz attorney, was the Vice President of Legal at Skillz; she reports directly to Andrew.[107] Chafkin is a director and Chief Revenue Officer at Skillz; he also reports directly to Andrew.[108] Given the amount of money now in the Trusts, and given "Jeremy's behavior," Pomerance testified that he enlisted Chafkin and Edelman because he needed additional support in investment management.[109]

Angered by this decision, on January 22, 2021, Jeremy forwarded to Andrew the December 2018 email memorializing the brothers' initial agreement with the cover email:

---

[104] JX-159.

[105] Trial Tr. at 207:19–208:10 (Jeremy).

[106] *Id.* at 175:6–21 (Jeremy); *see also* JX-158 at PET 010258–61 (January 22, 2021 text thread between Andrew and Jeremy arguing about the addition of Edelman and Chafkin to the Jeremy Trust); *see also* JX-160 at PET 004599–004600 (Acceptances of Appointment of Chafkin and Edelman signed January 22, 2021).

[107] Edelman Dep. Tr. at 8:9–11:9 (describing her work history).

[108] Chafkin Dep. Tr. at 7:17–10:4 (describing his work history); *id.* at 8:19–9:8 (describing how he was one of the first employees at Skillz); *id.* at 9:24–10:4 (stating that he reports directly to Andrew).

[109] Pomerance Dep. Tr. at 52:4–53:12.

"[s]ee below for the terms we both agreed on when we put the trust together."[110] Jeremy

also sent Andrew the below text message:

> This is a binary decision you need to make. Honor the deal we agreed to together when we setup [sic] the trusts. I.e.[,] remove [Edelman and Chafkin] from my trust and let me continue to build the real estate management company with the 50 percent of assets [w]e agreed are under my control or I'm going to be forced to hire attorneys and get this straightened out by a probate judge.[111]

In early 2021, Jeremy retained attorney Patricia Annino to represent him in connection with the Trusts. On February 28, 2021, Jeremy prepared a document for counsel, which he described as "a timeline and what actually happened to the best of my recollection to create the two trusts."[112] Jeremy had received Annino's help in formulating his version of events.[113]

In Jeremy's version of "what actually happened," Jeremy stated that Andrew let "Jeremy know that he could help him liquidate $1M worth of his shares *but he would only do so if Jeremy agreed to put the remaining shares in a trust*" and that "Jeremy went along with Andrew's proposal to gain some liquidity."[114] Jeremy further stated that Andrew agreed to transfer Skillz shares to the Andrew Trust—of which Jeremy is a beneficiary—

---

[110] JX-170.

[111] JX-158 at PET 010266. Jeremy testified that he found Edelman and Chafkin's appointment as fiduciaries "outrageous" because he had a bad relationship with them. Trial Tr. at 194:24–195:16 (Jeremy).

[112] JX-192 at PET 004705.

[113] Jeremy Dep. Tr. at 374:11–21 (describing how Annino drafted the description).

[114] JX-192 at PET 004706 (emphasis added).

to "seal the deal[.]"[115]  Regarding control, Jeremy wrote of himself: "Jeremy[,] seeing that his brother had exhibited more and more erratic behavior[,] decided that the control of the trusts had to change."[116]

### D.    Jeremy Files This Litigation.

On March 19, 2021, Hayward sent Jeremy and Annino GFM's file on its representation of Jeremy in connection with formation of the Trusts.[117]  Around the same time, Jeremy texted Pomerance concerning his rights regarding the Trust Protector.[118]  In their back-and-forth, Jeremy told Pomerance that Pomerance "need[s] to instruct your council [sic] to fix the Grantor order in my trust immediately so that I have control over the trust protector and fiduciaries in my trust that was built with stock that was GRANTED by me for the benefit of my family."[119]  Pomerance testified that this was the first he heard of Jeremy's claim to control the Jeremy Trust.[120]

On April 26, 2021, Jeremy filed a petition in this court seeking: reformation of the Jeremy Trust Agreement based on mistake (Count I); reformation based on fraud (Count

---

[115] *Id.*

[116] *Id.* at PET 0004707.

[117] JX-209.

[118] JX-207 at PET 006683 (stating that Edelman is "not a valid trustee").

[119] JX-207 at PET 006688 (emphasis in original).

[120] Pomerance Dep. Tr. at 191:21–193:21 (testifying that "the only time that [the Trust Protector issue] came up was after Jeremy got the Gordon file and I believe he concocted this argument based on what was in the file that he should have been in control of that trust."); *see also* Trial Tr. at 474:5–7 (Pomerance) ("Q. Did [Jeremy] say anything to indicate that he believed he was in control of the Jeremy Trust?  A. No."); *id.* at 477:24–478:22 (Pomerance) (testifying that Jeremy had not told him of any desire to control the Jeremy Trust prior to February 2021).

20

II); declaratory judgment invalidating Chafkin and Edelman's appointments to fiduciary positions, including that of Trust Protector, of the Jeremy Trust (Count III); removal of the fiduciaries (Count IV); and an accounting for both Trusts (Count V).[121] The initial complaint named as respondents Chafkin, Edelman, and Pomerance in their capacities as fiduciaries over the Jeremy Trust (together, "Respondents").[122] They moved to dismiss the petition on May 20, 2021.[123]

On November 29, 2021, the court granted Respondents' motion to dismiss Counts III, IV, and V,[124] leaving the two counts for reformation of the Jeremy Trust Agreement based on Jeremy's reformation claim on bases of unilateral mistake and fraud. The court set a two-day trial for May 3 and 4, 2022.[125] The parties completed post-trial briefing by September 6, 2022, and presented post-trial oral argument on September 26, 2022.[126] The parties submitted a completed joint schedule of evidence on October 10, 2022.[127]

In response to this litigation, Edelman and Chafkin resigned as Investment Direction Advisers of the Jeremy Trust and Trust Protectors and Distribution Advisers of the Andrew Trust, effective May 19, 2021.[128]

---

[121] Dkt. 1 ("Pet.") ¶¶ 147–90; *see also* JX-228 (same).

[122] *See* Dkt. 90 (Resp'ts' Answer) at 1.

[123] *See* Dkt. 38 (Resp'ts' Mot. to Dismiss).

[124] Dkt. 84 (Nov. 29, 2021 Memorandum Op.); *see also* JX-248 (same).

[125] Dkt. 82.

[126] *See* Dkts. 210, 213.

[127] Dkt. 214.

[128] *See* Dkt. 40, Ex. 3.

## II.  LEGAL ANALYSIS

Jeremy's primary claim for relief seeks to reform the text of Section 12(h) of the Jeremy Trust Agreement to put himself in first position to remove or replace the Trust Protector.  Jeremy argues that success on his claim for reformation further requires that the court invalidate Respondents' appointments and "appoint a qualified and independent" Trust Protector to both the Andrew and Jeremy Trusts.[129]  Jeremy has failed to meet his burden of proof on his claim for reformation.  Because Jeremy's other requests for relief rest on his claim for reformation, they too fail.

The elements of a claim to reform a trust instrument depend on whether a trust is donative or whether it was formed for consideration.  When a trust is donative, "the terms of the trust may be reformed by the court to conform the text to the intention of the settlor if the following are established by clear and convincing evidence: (1) that a mistake of fact or law . . . affected the specific terms of the document; and (2) the settlor's intention."[130]  A unilateral mistake by the settlor is a sufficient ground for reforming a trust that was created without any consideration.[131]

---

[129] *See id.* at 54.  Because Edelman and Chafkin have resigned from their positions, Jeremy's desired order removing them is moot.

[130] Restatement (Third) of Trusts cmt. b; *see also In re Est. & Tr. of Kalil*, 2018 WL 793718, at *9 (Del. Ch. Feb. 7, 2018) (Master's Report), *adopted*, 2018 WL 11028294 (Del. Ch. June 11, 2018).

[131] *In re Tr. Under Will of Flint ex rel. Shadek*, 118 A.3d 182, 195 (Del. Ch. 2015) (collecting authorities); *see also* 90 C.J.S. *Trusts* § 92 (2021) (stating that "since a settlor usually receives no consideration for the creation of a trust, a unilateral mistake by the settlor is ordinarily sufficient to warrant reformation").

On the other hand, "[w]here consideration is involved in the creation of a trust, the rules governing transfers for value and contracts are applicable."[132] Outside of the donative trust context, reformation is "appropriate only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence."[133]

Jeremy advances two theories in support of reformation. His first theory is that of "unilateral mistake"—he argues that the Jeremy Trust was donative and that he was mistaken as to its terms.[134] Respondents dispute that the Jeremy Trust was donative, arguing that the trust was entered into as part of a larger arrangement in which Jeremy received consideration.[135] Jeremy disputes the factual allegations on which Respondents' larger-arrangement theory rests.

Jeremy also advances a theory in the alternative, claiming that reformation is appropriate even if the Jeremy Trust was formed for consideration because he was misled into believing he would have control over the Jeremy Trust. Jeremy describes this second theory as a "fraud theory," but it more neatly maps on to what treatises refer to as a "mistake

---

[132] Restatement (Third) of Trusts § 62 cmt. a (Am. L. Inst. 2003).

[133] *CC Fin. LLC v. Wireless Props., LLC*, 2012 WL 4862337, at *6 (Del. Ch. Oct. 1, 2012) (quoting *Heartland Del. Inc. v. Rehoboth Mall Ltd. P'ship*, 2012 WL 3656440, at *5 (Del. Ch. Aug. 27, 2012)).

[134] Pet'r's Opening Post-Trial Br. at 29–31.

[135] Resp'ts' Post-Trial Answering Br. at 44–48.

in expression or inducement" theory.[136] The semantics reflect subtle distinctions that are largely irrelevant to this analysis, so this decision refers to Jeremy's second theory as the "fraud theory."

Intent is a common element to Jeremy's two legal theories. To prevail on a theory of unilateral mistake, Jeremy must demonstrate that his true intent at the time of executing the trust was to have ultimate control over the appointment and removal of the Trust Protector.[137] To prevail on his fraud theory, Jeremy must show that a mistake of fact or law caused him to sign the Jeremy Trust Agreement because, as written, he thought it reflected his control over the Jeremy Trust.[138]

---

[136] *See* 1 Austin Wakeman Scott, William Franklin Fratcher, Mark L. Ascher, *Scott and Ascher on Trusts* § 4.6.3, at 224 (5th ed. 2006); *see also* Restatement (Third) of Prop.: Wills and Donative Transfers § 12.1 (2003) cmt. i ("A mistake in the inducement arises when a donative document includes a term that was intended to be included or fails to include a term that was not intended to be included, but the intention to include or not to include the term was the product of a mistake of fact or law.").

[137] This is true regardless of whether Jeremy need *only* show unilateral mistake, or whether the presence of consideration also requires a showing of "knowing silence" on the part of the counterparties. *See, e.g.*, *Glidepath Ltd. v. Beumer Corp.*, 2018 WL 2670724, at *12–13 (Del. Ch. June 4, 2018).

[138] *See* Restatement (Third) of Prop.: Wills and Donative Transfers § 12.1 cmt. i. Even if this court views Jeremy's fraud theory as a genuine fraud claim rather than an ersatz mistake-in-the-inducement claim, Jeremy must show that he genuinely intended to have control over the Jeremy Trust to show that he relied on representations made to him. *See, e.g.*, *In re Swervepay Acq., LLC*, 2022 WL 3701723, at *23 (Del. Ch. Aug. 26, 2022) ("In order to plead a claim of fraud . . . the plaintiff must in fact have acted or not acted in justifiable reliance on the representation.") (internal quotation marks omitted). Because the misrepresentations Jeremy allege are various promises by Steinkrauss, Andrew, and others that Jeremy would be in control of the Jeremy Trust, Jeremy can only claim to have relied on these promises if they actually led him to believe he was in control of the Jeremy Trust. So, under these circumstances, whether one analyzes Jeremy's fraud claim as fraud itself or mistake in the inducement, he must provide evidence of what he actually intended.

Reformation derives from a party's intent and requires a petitioner to show that he "came to a specific prior understanding that differed materially from the written agreement."[139] "A settlor's intent at the time a trust is established is the controlling inquiry; an intent developed after creating a trust is irrelevant for purposes of construing the trust."[140]

This court has held that a party's "general understanding" is insufficient to carry that party's burden.[141] And a "plaintiff that has no belief [at all] is not mistaken."[142] "[D]irect evidence of intention contradicting the plain meaning of the text as well as other evidence of intention may be considered."[143] When evaluating intent in the trust modification context, generally, the "expression need not be in formal terms."[144]

Jeremy must establish his intent by clear and convincing evidence. "To establish proof by clear and convincing evidence means to prove something that is highly probable, reasonably certain, and free from serious doubt. Imposing this heightened burden for a

---

[139] *See Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 712 (Del. 2019) (internal quotation marks omitted).

[140] *Raymond L. Hammond Irrevocable Trust Agreement*, 2016 WL 359088, at *5 (Del. Ch. Jan. 28, 2016); *see also Emmert v. Prade*, 711 A.2d 1217, 1219 (Del. Ch. 1997) ("Plaintiff seeks reformation in order to bring the documents into conformity with an intention that arose (if at all) several years after the original contracts were executed. This is not the purpose of reformation.").

[141] *Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *7–9 (Del. Ch. Mar. 13, 2000).

[142] *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1155 (Del. 2002).

[143] Restatement (Third) of Prop.: Wills and Donative Transfers § 12.1 (2003).

[144] *Kalil*, 2018 WL 793718, at *6 (Del. Ch. Feb. 7, 2018). Although the *Kalil* court address expression of intent in the context of trust revocation or amendment, its more generalized discussion of a settlor's intent is relevant here.

claim for reformation preserve[s] the integrity of written agreements[.]"[145] This "requires evidence that produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is highly probable."[146]

Jeremy's claims fail because he has not proven by clear and convincing evidence that he held a mistaken intent about Section 12(h) at the time that he executed the Jeremy Trust Agreement.

To recap, Jeremy claims that he "intended to be in charge of (or maintain control over) the Jeremy Trust and this intent never changed." [147] Jeremy points to eleven communications as evidence of this intent.[148] This evidence can be divided into four categories: (1) communications from GFM during the trust formation process between March 6 and March 14; (2) communications from Mintz between February 25 and March 20 asking the brothers what Jeremy wants; (3) communications from Jeremy after trust formation; and (4) a handful of additional miscellaneous communications. None of these communications evidence the intent Jeremy seeks to show in this litigation. The court considers the communications category-by-category.

---

[145] *Glidepath*, 2018 WL 2670724, at *10 (citations and internal quotation marks omitted).

[146] *Parke Bancorp Inc.*, 217 A.3d at 710 (internal quotation marks omitted).

[147] *See, e.g.*, Pet'r's Opening Post-Trial Br. at 26; *see also id.* at 1–2 (asserting that "the material change to Article 12(h) of the Jeremy Trust agreement prior to its execution was done without Jeremy's knowledge, authorization[,] or consent; and . . . this material change altered the terms to the Jeremy Trust so that Andrew (and not Jeremy) would be in the first position to remove and replace the trust protector under Article 12(h).").

[148] *See* Pet'r's Opening Post-Trial Br. at 26–27.

First, there are communications from GFM to Jeremy and Andrew during the trust formation process:[149]

- GFM's March 6, 2019 outline stating that it is customary for a grantor, in this case Jeremy, to control removal and replacement of the Trust Protector.[150]

- Internal GFM drafting notes dated March 11, 2019 stating, in shorthand, that Section 12(h) should read "(1) Grantor (2) Grantor's Brother[.]"[151]

- GFM's March 14, 2019 draft of the Jeremy Trust Agreement, along with a summary letter, reflecting Jeremy in the first position in Section 12(h).[152] Jeremy emphasizes that GFM's summary letter specifically asked him, rather than Andrew, to "let [GFM] know who you wish to serve in this role [of Trust Protector]."[153]

The first category of communications does not evidence Jeremy's actual intent. The March 6 outline states: "I *typically* provide in my trusts that the grantor, while living and competent, followed by the beneficiaries . . . have the authority to remove and replace the Trust Protector."[154] That outline was circulated by Hutchinson, a GFM paralegal, noting that it came from Gordon at GFM.[155] Neither Gordon nor Hutchinson had spoken to Jeremy before sending him the outline.[156] And although Jeremy testified that he read it, he did not respond to the email, nor did he give testimony explaining what he made of the part

---

[149] JX-51, JX-59, JX-63.

[150] JX-51 at 11–12.

[151] *See* JX-59.

[152] JX-63 at GFM 000291, GFM 000331.

[153] *Id.* at 000292.

[154] *Id.* at GFM 000438 (emphasis added).

[155] JX-51 at GFM 000427.

[156] *See* Gordon Dep. Tr. at 31:17–21. The record does not reflect any conversation between Hutchinson and Jeremy prior to March 6, 2019.

discussing removal and replacement of the Trust Protector.[157] Because Jeremy did not discuss the outline with GFM before it was circulated, it cannot reflect Jeremy's intent. Best understood, the outline reflects GFM's default (i.e., "typical") practice of giving first line removal power to a trust's grantor.

The March 11 notes do not provide clear support for Jeremy's position.[158] The March 11 notes were taken by Patricia Vernon, a GFM paralegal who attended a meeting with at least one of the Paradise brothers.[159] These notes indicate that Jeremy, as grantor, should be in first line position in Section 12(h) while Andrew would be second. Hayward testified that this arrangement was not "standard practice[,]" i.e., it was not typical to have brothers serve in the hierarchy of persons able to remove and replace a Trust Protector.[160] Because the arrangement was not standard practice, Jeremy argues that the March 11 notes are "circumstantial evidence that someone told GFM about Jeremy's intent[.]"[161] It is equally plausible, however, that the paralegal who took these notes followed GFM's typical practice to keep a grantor in first position until otherwise instructed. This explanation is consistent with the fact that GFM later asked for confirmation on who should be in first position in Section 12(h).[162]

---

[157] Trial Tr. at 166:5–20 (Jeremy); Jeremy Dep. Tr. at 137:6–138:15.

[158] *See* JX-59, JX-63.

[159] Trial Tr. at 56:12–57:23 (Hayward) (discussing JX-59).

[160] Trial Tr. at 67:21–68:2 (Hayward).

[161] Pet'r's Opening Post-Trial Br. at 13–14.

[162] *See* JX-100 at GFM 000121 (April 23, 2019 email from Hayward to Steinkrauss saying that if Andrew's placement in first position "should be changed, please let me know").

Furthermore, evidence that "someone told" GFM about Jeremy's intent—without more—leaves the court without much on which to hang its hat. Jeremy has not said or shown that, prior to March 11, he ever told anyone about his preference with respect to removal and replacement of the Trust Protector.[163] Most charitably, the March 11 notes might have reflected instructions from Jeremy, but they might not have. The March 11 document is hardly clear and convincing evidence.

The default practice reflected in the March 6 outline and March 11 notes provide context for the March 14 draft of the Jeremy Trust Agreement, which had Jeremy in first position in Section 12(h). This choice was likely also a holdover from GFM's typical practice of giving a grantor first-line authority to remove and replace a Trust Protector. And although GFM had asked Jeremy whom he, as grantor, wanted to serve in the initial Trust Protector role,[164] Jeremy never responded to that question.[165]

Second, there are Mintz's communications that discussed what Jeremy might want on various trust-related issues:[166]

---

[163] *See* Jeremy Dep. Tr. at 147:15–150:13 (Jeremy testifying that all he could remember about the trust formation was an "introductory call" with GFM that was "very vague").

[164] JX-63 at 000292.

[165] *See* Trial Tr. at 40:18–41:9 (Gordon) ("Q. So just to confirm, you didn't have any conversations with Jeremy before those initial drafts were sent; right? A. I did not. Q. Jeremy never contacted you following receipt of those drafts; is that right? A. I don't believe he did. Q. You don't have any evidence that Jeremy reviewed those first drafts of the trust agreement; is that right? A. Other than them being sent to him, no."); *see also id.* at 251:22–254:16 (Jeremy).

[166] JX-69, JX-75.

- A March 19, 2019 email from Steinkrauss to Gigi Orta of JPMorgan stating: "Jeremy may need you to be more than just the administrative trustee on his trust."[167]

- A March 20, 2019 email from Glover to the brothers suggesting that Jeremy "name someone outside of Massachusetts instead of naming [Pomerance]" to the Trust Protector role.[168]

These emails are not probative concerning Jeremy's intent regarding Section 12(h).[169] These emails do not even directly engage with the issue of who should have first line authority to remove or replace the Trust Protector. Instead, they address the separate inquiry of whom the brothers might appoint to the position of initial Trust Protector. These emails might reflect that Mintz at some level thought it represented Jeremy's best interests—either vicariously through its representation of Andrew, or through a separate representation of Jeremy.[170] But what *Jeremy* was himself thinking is not apparent.

Steinkrauss's March 19 email mentions what Jeremy "might need[.]"[171] Steinkrauss later clarified that Andrew had told him that "Jeremy needed JPMorgan to have other roles [beyond administrative trustee] and I was simply passing along that information."[172] The record does not reflect Jeremy ever contacting Steinkrauss or anyone else to express his

---

[167] JX-69.

[168] JX-75.

[169] *See* Pet'r's Opening Post-Trial Br. at 27–28 (stating, without more explanation, that "[a]ll of these documents make clear it was Jeremy's intent to have control over the Jeremy Trust—in whatever form was appropriate under Delaware trust law.").

[170] As stated earlier, Mintz has denied that it ever represented Jeremy. *See* Steinkrauss Dep. Tr. at 318:9–20; 324:2–4. The court need not address whether, as a matter of law, Mintz at any time created an attorney-client relationship with Jeremy.

[171] JX-69.

[172] *See* Steinkrauss Dep. Tr. at 128:7–20.

30

desires regarding Gigi Orta's role.[173] Jeremy has introduced no evidence challenging the credibility of Steinkrauss's explanation. It is therefore hard to glean anything meaningful about what was in Jeremy's mind from this email.

Nor is the March 20 email probative as to Jeremy's intent. At most, it shows that Glover thought that the brothers were, collectively, in charge of deciding who the Trust Protector would be. Glover otherwise testified that she never actually spoke to Jeremy, whether about Section 12(h) or otherwise, aside from this email.[174]

Third, there are Jeremy's communications to Pomerance and Andrew between September 2020 and January 2021. Jeremy offers the following:

- A September 9, 2020 text from Jeremy to Pomerance saying: "there are two trusts. Your [sic] trustee of one that I'm beneficiary of. I'm trustee of the other that [Jeremy's son] and my mom are beneficiaries of."[175]

- A December 17, 2020 text from Jeremy to Pomerance stating "Andrew has no legal title on my trust."[176]

- A January 22, 2021 text message in which Jeremy told Andrew he could not appoint Chafkin or Edelman as fiduciaries.[177] Jeremy also adds that, right after he sent this text message, he looked at Andrew's email from December 11, 2018 and forwarded it to both Andrew and Pomerance.[178]

---

[173] *See, e.g.*, JX-90 at PET 006606 (text thread between Andrew and Jeremy on April 2, 2019, in which Andrew says he would change the trustee to a Delaware company "when I talk to Gigi"); *see also* Trial Tr. at 181:12–23 (Jeremy) (Jeremy stating that he had become uninterested in general trust-related tasks by April 2, 2019).

[174] Glover Dep. Tr. at 121:2–122:22.

[175] JX-149.

[176] JX-155.

[177] JX-158 at PET 010262.

[178] *See* Trial Tr. at 198:9–199:24 (Jeremy); JXs-169–170.

These documents do evidence Jeremy's beliefs, but only well after trust formation. They therefore do not speak directly to the relevant inquiry—Jeremy's intent at the time of the trust's formation.[179] Several of these communications also do not bear on the relevant question. For instance, in the September 9, 2020 text, Jeremy claims to be the trustee of the Jeremy Trust—a statement that is inaccurate.[180] Furthermore, his December 17, 2020 text merely states that Andrew lacks title to the Jeremy Trust. Although he seems to have meant that Andrew did not have authority to control the Jeremy Trust, this statement at most reflects a "general understanding" of control rather than a particularized expectation about Section 12(h).[181]

Jeremy's January 2021 communications also do not support him. Although Jeremy forwarded Andrew's December 12, 2018 email (discussed in the fourth category of documents) to Andrew and Pomerance, he selectively ignored the subsequent changes that the brothers made to their trust structure since then.

Fourth, Jeremy relies on a handful of miscellaneous communications:

- Andrew's December 12, 2018 email suggesting that Jeremy would be the "lead trustee";

- Andrew's February 19, 2019 follow-up on his December 12, 2018 email; and

---

[179] *See Hammond*, 2016 WL 359088, at *4 ("A settlor's intent at the time a trust is established is the controlling inquiry; an intent developed after creating a trust is irrelevant for purposes of construing the trust.").

[180] *See, e.g.*, JX-101 at PET 009546, 009562 (making the Bryn Mawr Trust Company of Delaware the Trustee of the Jeremy Trust).

[181] *See Cantor*, 2000 WL 307370, at *7.

- A February 25, 2019 phone call the brothers had with Steinkrauss.[182]

Andrew's December 12 and February 25 emails are weak evidence of Jeremy's intent for three reasons. As an initial matter, Andrew—not Jeremy—drafted the initial terms. And when Jeremy responded, he only addressed the timing of the sale of Skillz stock relative to the setup of the trust—*not* the substantive terms of control that Andrew had laid out.[183] Jeremy's silence on the issue of control might have been the result of an implicit endorsement of Andrew's two-trustee proposal. But his silence might simply have reflected a lack of interest in who would control the trust. Clear and convincing evidence does not show otherwise.

In addition, it is not clear what Andrew had in mind in December 2018 when using the terms "lead trustee" and "other trustee," nor is it clear how those control positions would relate to the removal of the Trust Protector. Andrew and Jeremy are not lawyers, so they might have conceived of "trustee" in a non-technical sense more akin to "supervisor." The most logical inference to draw is that the brothers agreed to share control. With that in mind, Jeremy has not shown how an agreement to share control indicates who he later imagined would have the power to remove and replace the Trust Protector.

Also, subsequent advice of counsel changed the brothers' approach to the trust structure. Specifically, on February 25, 2019, Steinkrauss advised the brothers against

---

[182] JX-27; JX-29 at PET 001210–11; JX-36; Trial Tr. at 156:15–158:16 (Jeremy).

[183] *See* JX-29 at PET 001206 (email dated December 13, 2018, from Jeremy to Andrew saying "I was thinking that upon execution of the sale of the equity proceeds and remaining stock would get moved into trust. Something like that?").

appointing Jeremy as both trustee and beneficiary, voicing tax and asset protection concerns.[184]  And, at some point after Andrew's February 19 email, the brothers changed their mind about forming one trust, instead deciding to form two.  Both changes suggest that Jeremy's anticipated role as "lead trustee" was subject to later revision.

Jeremy's recollection of the February 25, 2019 phone call with Steinkrauss does not prove Jeremy's case.  Jeremy recalls Steinkrauss saying that the trust would have a "trusted advisor and friend" in a control position, and if that person "was not doing what you wanted, you'd remove them."[185]  Steinkrauss, however, could not remember saying these words to Jeremy.[186]  Nor could Andrew recall the February 25 conversation.[187]  Jeremy is effectively asks the court to endorse his free-standing testimony at trial as clear and convincing evidence of his intent when the trust was formed.  But given Jeremy's obvious interest in the outcome, his uncorroborated memory at trial of a phone call from several years prior is not sufficiently credible to meet his burden.

In addition to these communications, Jeremy claims in post-trial briefing that Andrew "admits that Jeremy intended to be in charge of the Jeremy Trust," but the parts of

---

[184] Jeremy Dep. Tr. at 120:7–121:19; Trial Tr. at 447:1–448:6 (Andrew); Trial Tr. at 157–13 (Jeremy).

[185] Pet'r's Opening Post-Trial Br. at 26 (quoting Trial Tr. at 158:1–8 (Jeremy)); *see also* Trial Tr. at 300:1–5 (Jeremy) ("Q. [I]n your conversation with Mr. Steinkrauss, did he say that if you were the lead trustee, you could essentially control the assets in the trust?  A. He did.").

[186] Steinkrauss Dep. Tr. at 47:19–50:17 (testifying that he only recalled a call with "only me and Andrew" but could not recall if he had separately spoken to Jeremy).

[187] Trial Tr. at 403:7–17 (Andrew).

Andrew's deposition testimony that he cites as evidence say nothing of the kind.[188] In the deposition testimony upon which Jeremy relies, Andrew discussed how the brothers changed their plans from December 2018 to create one trust and eventually decided to create two separate ones for reasons discussed earlier.[189] This testimony has no bearing on whether Jeremy was supposed to control the Jeremy Trust in general or, in particular, where in Section 12(h) he was supposed to sit.

Unable to establish a specific intent as to his ability to remove and replace the Trust Protector at the relevant time, Jeremy makes a last-ditch effort at a counterfactual theory. He argues that, had he been fully informed of what the final version of Section 12(h) looked like, "the Trust, with its present language, would never have been executed."[190] In his deposition, Jeremy stated, "I would never have allowed my brother to have control of . . . my first order of grantor or whatever it is status of the Jeremy Paradise Dynasty Trust, period."[191]

The problem with this theory is that after-the-fact regret is not relevant to the intent inquiry.[192] Although Jeremy can point to certain text messages from January 2021 in which

---

[188] *See* Pet'r's Opening Post-Trial Br. at 29 (citing Trial Tr. at 399:14–400:22, 411:24–412:7, 416:12–416:21, 447:1–24 (Andrew)).

[189] *See* Trial Tr. at 399:14–400:22, 411:24–412:7, 416:12–416:21, 447:1–24 (Andrew).

[190] Pet'r's Opening Post-Trial Br. at 5.

[191] Jeremy Dep. Tr. at 164:5–167:5.

[192] *See, e.g.*, *Hammond*, 2016 WL 359088, at \*4 (stating that a party's intent in trust interpretation "at any time *other than* when he created the Trust is wholly irrelevant."). Although the *Hammond* court made this statement in the context of trust agreement

he manifested an expectation of complete control over the Jeremy Trust, Jeremy has not substantiated his *ex post* belief with evidence from the time of trust formation two years prior.

The strongest inference from the record is that Jeremy had *no* clear intent regarding Section 12(h) at the time he executed the Jeremy Trust Agreement because he had not read the documents, had no interest in their contents, and was focused on other life events.[193]  A lack of understanding is not the sort of clear intent needed to support a claim for reformation.[194]  And it would make bad policy for this court to allow a party to rewrite trust terms which the party comes to dislike years after executing a trust agreement.[195]

In this way, this case resembles *Cantor*.[196]  There, the defendants sought to reform a commercial contract, but admitted during discovery not to have an independent understanding of the agreement when they signed it.[197]  One of the defendants then proceeded to testify that she had a "general understanding" that she would be able to

---

interpretation rather than reformation, the logic is applicable in the reformation context as well.

[193] *See* Trial Tr. at 253:5–261:7 (Jeremy) (stating, among other things, that by the time Jeremy signed the trust documents, he "did not feel like participating or editing anything anymore.").

[194] *See Cantor*, 2000 WL 307370, at *7–9 (stating that the focus of the parties' reformation claims is the "understanding they possessed *at the time the Agreements were drafted*") (emphasis in original).

[195] *See Shadek*, 118 A.3d at 195 ("In my view, the limited circumstances under which a Delaware court will order reformation indicate . . . that modification is not freely available as a matter of convenience.").

[196] 2000 WL 307370.

[197] *Id.* at *7–8.

develop a "free, independent, strong company" based on a conversation with the plaintiff's representative where the representative told the defendant that she could "trust him" and that he would "never harm" her company.[198] After trial, the court denied the defendants' reformation claims based on insufficient evidence of the defendants' intent.[199]

Here, as in *Cantor*, Jeremy seeks reformation claims based on a generalized understanding (at best) of the written instrument at issue rather than a particular provision. Furthermore, like in *Cantor*, the evidence indicates that Jeremy's reconstruction of what he intended at the time developed *after* the fact of signing the instrument.[200]

In sum, Jeremy has not presented evidence establishing that he had the intent necessary to support a reformation claim. He has thus not met his burden of producing clear and convincing evidence that he was mistaken about Section 12(h) at the time of forming the Jeremy Trust.

The parties raise several legal arguments in the alternative. First, Respondents argue that the presence of consideration requires Jeremy to buttress his unilateral mistake theory with a showing of "knowing silence" on Respondents' or Andrew's part.[201] In other words, according to Respondents, Jeremy must show that either Andrew or Respondents knew of Jeremy's mistaken belief regarding Section 12(h) but suckered him into signing the Jeremy

---

[198] *Id.* at *7 (internal quotation marks omitted).

[199] *Id.* at *8–9.

[200] *Id.* at *8.

[201] Resp'ts' Post-Trial Answering Br. at 44–48. Respondents urge that consideration existed in the form of the brothers' informal deal in which Andrew would help liquidate Jeremy's Skillz stock if Jeremy put the remainder of his stock in trust. *See id.* at 44–46.

Trust Agreement anyway. Respondents urge that Jeremy has not met his burden on this point.[202]

Jeremy responds by emphasizing first the absence of consideration on the face of the Jeremy Trust Agreement, thus cutting off Respondents' argument at the threshold.[203] Jeremy then argues that, even if he were required to show knowing silence, the facts militate in favor of such a finding.[204]

Jeremy also asserts his "fraud theory" (discussed earlier), which the presence of consideration would not bar.[205] Respondents counter that Jeremy cannot show that "any affirmative misrepresentation was made to him, or material information was withheld from him, in connection with the formation of the Jeremy Trust."[206]

The court need not reach these alternative arguments. Jeremy's unilateral mistake theory would fail regardless of the "knowing silence" issue because he has failed to prove a mistake in the first place. And Jeremy cannot substantiate his fraud theory because he cannot show that he relied on any representations made to him throughout the trust agreement drafting process.[207] In short, the court's factual findings defeat these theories.

---

[202] *Id.* at 48–53.

[203] Pet'r's Opening Post-Trial Br. at 44–51.

[204] *Id.* at 31–35.

[205] *Id.* at 35–44.

[206] Resp'ts' Post-Trial Answering Br. at 59–60.

[207] *See, e.g.*, *In re Swervepay Acquisition, LLC*, 2022 WL 3701723, at \*23 (Del. Ch. Aug. 26, 2022) ("In order to plead a claim of fraud . . . the plaintiff must in fact have acted or not acted in justifiable reliance on the representation.") (internal quotation marks omitted).

## III.    CONCLUSION

Jeremy has failed to prove his reformation claims by clear and convincing evidence. Judgment is entered in favor of Respondents. Accordingly, Jeremy's request for fee-shifting of attorneys' fees and costs[208] is also denied. Respondents shall prepare a form of order implementing this decision within ten days, providing Jeremy at least five days to review the form.

---

In this alternative, the court ignores the fact that Jeremy's fraud theory is truly an ersatz mistake-in-the-inducement theory as discussed above.

[208] *See* Pet'r's Opening Post-Trial Br. at 52–56.